1  ALAN R. BRAYTON, ESQ., S.B. #73685
   DAVID R. DONADIO, ESQ., S.B. #154436
2  BRAYTON❖PURCELL LLP
   Attorneys at Law
3  222 Rush Landing Road
   P.O. Box 6169
4  Novato, California  94948-6169
   (415) 898-1555
5  (415) 898-1247 (Fax No.)

6  Attorneys for Plaintiff

7

8              UNITED STATES DISTRICT COURT

9              NORTHERN DISTRICT OF CALIFORNIA

10             SAN FRANCISCO DIVISION

11 NORMAN ESTES,                    )    No. _____
                                    )
12             Plaintiff,           )
                                    )    COMPLAINT FOR ASBESTOS
13 vs.                              )    PERSONAL INJURY/ PRODUCTS
                                    )    LIABILITY; DEMAND FOR JURY TRIAL
14 GENERAL ELECTRIC COMPANY, CBS    )
   CORPORATION (FKA VIACOM INC.,    )
15 FKA WESTINGHOUSE ELECTRIC        )
   CORPORATION), ROCKWELL           )
16 AUTOMATION, INC.,                )
                                    )
17             Defendants.          )

18

19                          I.

20                       PARTIES

21      1.    Plaintiff in this action, NORMAN ESTES, has sustained asbestos-related lung

22 injuries as a result of his inhalation of asbestos fibers through his occupational exposure to

23 asbestos.

24      2.    Plaintiff sustained an asbestos-related lung disease by the inhalation of asbestos

25 fibers released during the handling of asbestos-containing products at Plaintiff's jobsites.

26      3.    The pathogenesis of Plaintiff's asbestos-related diseases is explained on **Exhibit

27 A**, attached to Plaintiff's complaint and incorporated by reference herein.

28 ///

BRAYTON❖PURCELL LLP
ATTORNEYS AT LAW
222 RUSH LANDING ROAD
P O BOX 6169
NOVATO, CALIFORNIA 94948-6169
(415) 898-1555

4.      All of Plaintiff's claims arise out of repeated exposure to asbestos-containing products manufactured, distributed, and/or sold by defendants and supplied to, installed and/or maintained by defendants at Plaintiff's worksites, over a period of years, caused from release of toxic asbestos fibers and subsequent inhalation by the Plaintiff, resulting in cumulative, progressive, incurable lung diseases.

5.      Plaintiff claims damages for an asbestos-related disease arising from a series of occurrences not dependent on Plaintiff's worksite but on the fact that asbestos-containing products, when handled in the manner in which they were intended, released harmful asbestos fibers which when inhaled by Plaintiff, caused serious lung disease.

6.      As used herein, Plaintiff shall mean the above-captioned asbestos-injured Plaintiff.

7.      Plaintiff is informed and believes, and thereon alleges that at all times herein mentioned, Defendants were and are corporations, partnerships, unincorporated associations, sole proprietorships and/or other business entities organized and existing under and by virtue of the laws of the State of California, or the laws of some other state or foreign jurisdiction, and that said defendants, and each of them, were and are authorized to do and are doing business in the State of California, and that said defendants have regularly conducted business in the County of San Francisco, State of California.

## II.

## JURISDICTION, VENUE AND INTRADISTRICT ASSIGNMENT

8.      Jurisdiction: Plaintiff NORMAN ESTES is a citizen of the State of California.

Defendants are each corporations incorporated under the laws of and having its principal places of business in the following States:

| DEFENDANT | STATE |
|---|---|
| GENERAL ELECTRIC COMPANY | New York/Connecticut |
| CBS CORPORATION (FKA VIACOM INC., FKA WESTINGHOUSE ELECTRIC CORPORATION) | Delaware/New York |
| ROCKWELL AUTOMATION, INC. | Delaware/Wisconsin |

1    This Court has original jurisdiction under 28 U.S.C. § 1332, in that it is a civil action

2  between citizens of different states in which the matter in controversy exceeds, exclusive of costs

3  and interest, seventy-five thousand dollars.

4    9.    Venue / Intradistrict Assignment. Venue is proper in the Northern District of

5  California and assignment to the San Francisco Division of said district is proper as a substantial

6  part of the events or omissions which give rise to the claims asserted by Plaintiff herein occurred

7  within the County of San Francisco, California, and Defendants are subject to personal

8  jurisdiction in this district at the time the action is commenced.

9

## III.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
(Negligence)

13    PLAINTIFF NORMAN ESTES COMPLAINS OF DEFENDANTS GENERAL

14  ELECTRIC COMPANY, CBS CORPORATION (FKA VIACOM INC., FKA

15  WESTINGHOUSE ELECTRIC CORPORATION), ROCKWELL AUTOMATION, INC.,

16  THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AND FOR A CAUSE OF

17  ACTION FOR NEGLIGENCE ALLEGES:

18    10.    At all times herein mentioned, each of the named defendants was the successor,

19  successor in business, successor in product line or a portion thereof, assign, predecessor,

20  predecessor in business, predecessor in product line or a portion thereof, parent, holding

21  company, affiliate, venturer, co-venturer, subsidiary, wholly or partially owned by, or the whole

22  or partial owner of or member in an entity researching, studying, manufacturing, fabricating,

23  designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale,

24  supplying, selling, inspecting, testing, authorizing, approving, certifying, facilitating, promoting,

25  representing, endorsing servicing, installing, contracting for installation, repairing, marketing,

26  warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or

27  otherwise directing and/or facilitating the use of, or advertising a certain product, namely

28  asbestos, and/or other products containing asbestos. Said entities shall hereinafter collectively be

1  called ALTERNATE ENTITIES. Each of the herein named defendants is liable for the tortious

2  conduct of each successor, successor in business, successor in product line or a portion thereof,

3  assign, predecessor in product line or a portion thereof, parent, holding company, affiliate,

4  venturer, co-venturer, subsidiary, whole or partial owner, or wholly or partially owned entity, or

5  entity that it was a member of, or funded, that researched, studied, manufactured, fabricated,

6  designed, modified, labeled, assembled, distributed, leased, bought, offered for sale, supplied,

7  sold, inspected, serviced, installed, contracted for installation, repaired, marketed, warranted,

8  rebranded, manufactured for others and advertised a certain product, namely asbestos, and other

9  products containing asbestos. The following defendants, and each of them, are liable for the acts

10  of each and every ALTERNATE ENTITY, and each of them, in that there has been a virtual

11  destruction of Plaintiff's remedy against each such ALTERNATE ENTITY; defendants, and each

12  of them, have acquired the assets, product line, or a portion thereof, of each such ALTERNATE

13  ENTITY; defendants, and each of them, caused the destruction of Plaintiff's remedy against each

14  such ALTERNATE ENTITY; each such defendant has the ability to assume the risk-spreading

15  role of each such ALTERNATE ENTITY; and that each such defendant enjoys the goodwill

16  originally attached to each such ALTERNATE ENTITY:

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| GENERAL ELECTRIC COMPANY | MATTERN X-RAY<br>HOTPOINT ELECTRIC APPLIANCE COMPANY LIMITED<br>TRUMBULL ELECTRIC MANUFACTURING COMPANY<br>G E INDUSTRIAL SYSTEMS<br>CURTIS TURBINES<br>PARSONS TURBINES<br>GENERAL ELECTRIC JET ENGINES<br>HOTPOINT, INC.<br>GENERAL ELECTRIC SUPPLY CORPORATION |
| CBS CORPORATION (F/K/A VIACOM INC., F/K/A WESTINGHOUSE ELECTRIC CORPORATION) | VIACOM, INC.<br>CBS CORPORATION<br>WESTINGHOUSE ELECTRIC CORPORATION<br>WESTINGHOUSE ELECTRIC AND<br> MANUFACTURING COMPANY<br>B.F. STURTEVANT<br>KPIX TELEVISION STATION<br>PARAMOUNT COMMUNICATIONS, INC<br>GULF & WESTERN INDUSTRIES, INC.<br>NORTH & JUDD MANUFACTURING COMPANY<br>VAN NORMAN INDUSTRIES, INC. |

COMPLAINT FOR ASBESTOS PERSONAL INJURY/ PRODUCTS LIABILITY; DEMAND FOR JURY TRIAL

| DEFENDANT | ALTERNATE ENTITY |
|---|---|
| ROCKWELL AUTOMATION, INC. | ROCKWELL SPRING AND AXLE COMPANY |
| | TIMKEN-DETROIT AXLE COMPANY (THE) |
| | TIMKEN SILENT AUTOMATIC DIVISION |
| | ALLEN-BRADLEY COMPANY, LLC. |
| | ONEIDA ROSTONE CORPORATION |
| | ROSTONE CORPORATION |

11.   At all times herein mentioned, defendants, their ALTERNATE ENTITIES, and each of them, were and are engaged in the business of researching, manufacturing, fabricating, designing, modifying, labeling, assembling, distributing, leasing, buying, offering for sale, supplying, selling, inspecting, endorsing, testing, authorizing, approving, certifying, facilitating, promoting, representing, servicing, installing, contracting for installation, repairing, marketing, warranting, rebranding, manufacturing for others, packaging, specifying, requiring, mandating, or otherwise directing and/or facilitating the use of, or advertising a certain product, namely asbestos and other products containing asbestos.

12.   At all times herein mentioned, defendants, their ALTERNATE ENTITIES and each of them, singularly and jointly, negligently, and carelessly researched, manufactured, fabricated, designed, modified, tested or failed to test, abated or failed to abate, warned or failed to warn of the health hazards, labeled, assembled, distributed, leased, bought, offered for sale, supplied, sold, inspected, serviced, authorized, approved, certified, facilitated, promoted, installed, represented, endorsed, contracted for installation of, repaired, marketed, warranted, rebranded, manufactured for others, packaged and advertised, a certain product, namely asbestos, and other products containing asbestos, in that said products caused personal injuries to users, consumers, workers, bystanders and others, including the Plaintiff herein, (hereinafter collectively called "exposed persons"), while being used in a manner that was reasonably foreseeable, thereby rendering said products hazardous, unsafe and dangerous for use by "exposed persons".

13.   Defendants, their ALTERNATE ENTITIES, and each of them, had a duty to exercise due care in the pursuance of the activities mentioned above and defendants, and each of them, breached said duty of due care.

14.     Defendants, their ALTERNATE ENTITIES and each of them, knew, or should have known, and intended that the aforementioned asbestos and products containing asbestos and related products and equipment, would be transported by truck, rail, ship, and other common carriers, that in the shipping process the products would break, crumble, or be otherwise damaged; and/or that such products would be used for insulation, construction, plastering, fireproofing, soundproofing, automotive, aircraft and/or other applications, including, but not limited to unpacking, preparing, using, sawing, drilling, chipping, hammering, scraping, sanding, breaking, removing, maintaining, inspecting, "rip-out", and other manipulation, resulting in the release of airborne asbestos fibers, and that through such foreseeable use and/or handling "exposed persons", including Plaintiff herein, would use or be in proximity to and exposed to said asbestos fibers, which contaminated the packaging, products, environment, and clothing of persons working in proximity to said products, directly or through reentrainment.

15.     Plaintiff has used, handled, or been otherwise exposed to asbestos and asbestos-containing products referred to herein in a manner that was reasonably foreseeable. Plaintiff's exposure to asbestos and asbestos-containing products is on current information as set forth at various locations and circumstances in **Exhibit A**, attached to Plaintiff's complaint and incorporated by reference herein.

16.     As a direct and proximate result of the acts, omissions, and conduct of the defendants, their ALTERNATE ENTITIES, and each of them, as aforesaid, Plaintiff's exposure to asbestos and asbestos-containing products caused severe and permanent injury, damage, loss, or harm to the Plaintiff as set forth in **Exhibit A,** attached to Plaintiff's complaint and incorporated by reference herein.

17.     Plaintiff is informed and believes, and thereon alleges, that progressive lung disease, cancer, and other serious diseases are caused by inhalation or ingestion of asbestos fibers without perceptible trauma and that said injury, damage, loss, or harm results from exposure to asbestos and asbestos-containing products over a period of time.

///

///

18.     Plaintiff suffers from a condition related to exposure to asbestos and asbestos-containing products. Plaintiff was not aware at the time of exposure that asbestos or asbestos-containing products presented risk of injury and/or disease.

19.     As a direct and proximate result of the aforesaid conduct of defendants, their ALTERNATE ENTITIES, and each of them, Plaintiff has suffered, and continue to suffer, permanent injuries and/or future increased risk of injuries to their persons, body and health, including, but not limited to, asbestosis, other lung damage, and cancer, and the mental and emotional distress attendant thereto, from the effect of exposure to asbestos fibers, all to Plaintiff's general damage.

20.     As a direct and proximate result of the aforesaid conduct of the defendants, their "alternate entities," and each of them, Plaintiff has incurred, is presently incurring, and will incur in the future, liability for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays and other medical treatment, the true and exact amount thereof being unknown to Plaintiff at this time, and Plaintiff prays leave to amend this complaint accordingly when the true and exact cost thereof is ascertained.

21.     As a further direct and proximate result of the said conduct of the defendants, their "alternate entities," and each of them, Plaintiff has incurred pecuniary losses, the full nature and extent of which are not yet known to Plaintiff; and leave is requested to amend this complaint to conform to proof at the time of trial.

22.     Defendants, their ALTERNATE ENTITIES, and each of them, and their officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, each of the acts set forth herein.

23.     Defendants, their "alternate entities," and each of them, are liable for the fraudulent, oppressive, and malicious acts of their ALTERNATE ENTITIES, and each of them, and each defendant's officers, directors and managing agents participated in, authorized, expressly and impliedly ratified, and had full knowledge of, or should have known of, the acts of each of their ALTERNATE ENTITIES as set forth herein.

///

1    WHEREFORE, Plaintiff prays judgment against defendants, their "alternate entities," and

2    each of them, as hereinafter set forth.

3                                SECOND CAUSE OF ACTION
                                    (Products Liability)

4

5        AS AND FOR A SECOND, SEPARATE, FURTHER AND DISTINCT CAUSE OF

6    ACTION FOR PRODUCTS LIABILITY, PLAINTIFF NORMAN ESTES COMPLAINS OF

·7   DEFENDANTS GENERAL ELECTRIC COMPANY, CBS CORPORATION (FKA VIACOM

8    INC., FKA WESTINGHOUSE ELECTRIC CORPORATION), ROCKWELL AUTOMATION,

9    INC., THEIR "ALTERNATE ENTITIES," AND EACH OF THEM, AS FOLLOWS:

10       24.    Plaintiff incorporates herein by reference, as though fully set forth herein, the

11   allegations contained in each paragraph of the First Cause of Action herein.

12       25.    Defendants, their ALTERNATE ENTITIES, and each of them, knew and intended

13   that the above-referenced asbestos and asbestos-containing products would be used by the

14   purchaser or user without inspection for defects therein or in any of their component parts and

15   without knowledge of the hazards involved in such use.

16       26.    Said asbestos and asbestos-containing products were defective and unsafe for their

17.  intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death.

18   The defect existed in the said products at the time they left the possession of defendants, their

19   "alternate entities," and each of them.  Said products did, in fact, cause personal injuries,

20   including asbestosis, other lung damage, and cancer to "exposed persons", including Plaintiff

21   herein, while being used in a reasonably foreseeable manner, thereby rendering the same

22   defective, unsafe and dangerous for use.

23       27.    "Exposed persons" did not know of the substantial danger of using said products.

24   Said dangers were not readily recognizable by "exposed persons."  Said defendants, their

25   ALTERNATE ENTITIES, and each of them, further failed to adequately warn of the risks to

26   which Plaintiff and others similarly situated were exposed.

27       28.    In researching, manufacturing, fabricating, designing, modifying, testing or failing

28   to test, warning or failing to warn, labeling, assembling, distributing, leasing, buying, offering for

1   sale, supplying, selling, inspecting, servicing, installing, contracting for installation, repairing,

2   marketing, warranting, rebranding, manufacturing for others, packaging and advertising asbestos

3   and asbestos-containing products, defendants, their ALTERNATE ENTITIES, and each of them,

4   did so with conscious disregard for the safety of "exposed persons" who came in contact with

5   said asbestos and asbestos-containing products, in that said defendants, their ALTERNATE

6   ENTITIES, and each of them, had prior knowledge that there was a substantial risk of injury or

7   death resulting from exposure to asbestos or asbestos-containing products, including, but not

8   limited to, asbestosis, other lung damages and cancer. Said knowledge was obtained, in part,

9   from scientific studies performed by, at the request of, or with the assistance of, said defendants,

10  their ALTERNATE ENTITIES, and each of them, and which knowledge was obtained by said

11  defendants, their ALTERNATE ENTITIES, and each of them on or before 1930, and thereafter.

12      29.     On or before 1930, and thereafter, said defendants, their ALTERNATE

13  ENTITIES and each of them, were aware that members of the general public and other "exposed

14  persons", who would come in contact with their asbestos and asbestos-containing products, had

15  no knowledge or information indicating that asbestos or asbestos-containing products could

16  cause injury, and said defendants, their ALTERNATE ENTITIES, and each of them, knew that

17  members of the general public and other "exposed persons", who came in contact with asbestos

18  and asbestos-containing products, would assume, and in fact did assume, that exposure to

19  asbestos and asbestos-containing products was safe, when in fact said exposure was extremely

20  hazardous to health and human life.

21      30.     With said knowledge, said defendants, their ALTERNATE ENTITIES, and each

22  of them, opted to research, manufacture, fabricate, design, modify, label, assemble, distribute,

23  lease, buy, offer for sale, supply, sell, inspect, service, install, contract for installation, repair,

24  market, warrant, rebrand, manufacture for others, package and advertise said asbestos and

25  asbestos-containing products without attempting to protect "exposed persons" from or warn

26  "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and

27  asbestos-containing products. Rather than attempting to protect "exposed persons" from, or warn

28  "exposed persons" of, the high risk of injury or death resulting from exposure to asbestos and

1 | asbestos-containing products, defendants, their ALTERNATE ENTITIES, and each of them,

2 | intentionally failed to reveal their knowledge of said risk, and consciously and actively concealed

3 | and suppressed said knowledge from "exposed persons" and members of the general public, thus

4 | impliedly representing to "exposed persons" and members of the general public that asbestos and

5 | asbestos-containing products were safe for all reasonably foreseeable uses. Defendants, their

6 | ALTERNATE ENTITIES, and each of them, engaged in this conduct and made these implied

7 | representations with the knowledge of the falsity of said implied representations.

8 |     31.    The above-referenced conduct of said defendants, their ALTERNATE ENTITIES,

9 | and each of them, was motivated by the financial interest of said defendants, their ALTERNATE

10 | ENTITIES, and each of them, in the continuing, uninterrupted research, design, modification,

11 | manufacture, fabrication, labeling, assembly, distribution, lease, purchase, offer for sale, supply,

12 | sale, inspection, installation, contracting for installation, repair, marketing, warranting,

13 | rebranding, manufacturing for others, packaging and advertising of asbestos and asbestos-

14 | containing products. In pursuance of said financial motivation, said defendants, their

15 | ALTERNATE ENTITIES, and each of them, consciously disregarded the safety of "exposed

16 | persons" and in fact were consciously willing and intended to permit asbestos and asbestos-

17 | containing products to cause injury to "exposed persons" and induced persons to work with and

18 | be exposed thereto, including Plaintiff.

19 |     32.    Plaintiff alleges that the aforementioned defendants, their ALTERNATE

20 | ENTITIES, and each of them impliedly warranted their asbestos and asbestos-containing

21 | products to be safe for their intended use but that their asbestos and asbestos-containing products,

22 | created an unreasonable risk of bodily harm to exposed persons.

23 |     33.    Plaintiff further alleges his injuries are a result of cumulative exposure to asbestos

24 | and various asbestos-containing products manufactured, fabricated, inadequately researched,

25 | designed, modified, inadequately tested, labeled, assembled, distributed, leased, bought, offered

26 | for sale, supplied, sold, inspected, serviced, installed, contracted for installation, repaired,

27 | marketed, warranted, rebranded, manufactured for others, packaged and advertised by the

28 | aforementioned defendants, their ALTERNATE ENTITIES, and each of them and that Plaintiff

1   cannot identify precisely which asbestos or asbestos-containing products caused the injuries

2   complained of herein.

3        34.    Plaintiff relied upon defendants', their "alternate entities'", and each of their

4   representations, lack of warnings, and implied warranties of fitness of asbestos and their

5   asbestos-containing products. As a direct, foreseeable and proximate result thereof, Plaintiff has

6   been injured permanently as alleged herein.

7        35.    As a direct and proximate result of the actions and conduct outlined herein,

8   Plaintiff has suffered the injuries and damages previously alleged.

9        WHEREFORE, Plaintiff prays judgment against defendants, their ALTERNATE

10   ENTITIES, and each of them, as hereinafter set forth.

11                         **IV.**

12                        **PRAYER**

13        WHEREFORE, Plaintiff prays judgment against defendants, their ALTERNATE

14   ENTITIES, and each of them in an amount to be proved at trial, as follows:

15        (a)     For Plaintiff's general damages according to proof;

16        (b)     For Plaintiff's loss of income, wages and earning potential according to proof;

17        (c)     For Plaintiff's medical and related expenses according to proof;

18        (d)     For Plaintiff's cost of suit herein;

19        (f)     For damages for fraud according to proof; and

20        (g)     For such other and further relief as the Court may deem just and proper, including

21               costs and prejudgment interest.

22

23   Dated:   __7|10|17__            BRAYTON❖PURCELL LLP

24

25                              By: _____

26                                David R. Donadio, Esq., S.B. #154436
                                  Attorneys for Plaintiff

27

28

1

2

## JURY DEMAND

Plaintiff hereby demands trial by jury of all issues of this cause.

3

4

Dated:  _____7/10/17_____                    BRAYTON❖PURCELL LLP

5

6                                               By: _____

7                                                   David R. Donadio, Esq., S.B. #154436
                                                    Attorneys for Plaintiff

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A

EXHIBIT A

Plaintiff:  NORMAN ESTES

Plaintiff's injuries:  Plaintiff was diagnosed with mesothelioma on or about October 2016 and asbestos-related pleural disease on or about September 1993, and may have other asbestos-related diagnosis to be determined.

Retirement Status:

Plaintiff retired from his last place of employment as a result of becoming disabled due to an illness not related to asbestos.  He has therefore suffered no disability from his asbestos-related disease as "disability" is defined in California Code of Civil Procedure § 340.2.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Crowell Collier Broadcasting Corp. 866 3rd Ave New York, NY | Tempo Productions, San Francisco, CA | Disc Jockey | 10/1962-12/1962 |

Job Duties: Plaintiff worked as a disc jockey. Plaintiff stocked records and took care of mail.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Western Merchandise Mart 1355 Market Street San Francisco, CA | Cataffo Market 2301 Van Ness Ave. San Francisco, CA | Stockboy | 7/1963-9/1963; 1/1964-9/1964 |
| | Western Merchandise Mart 1355 Market Street San Francisco, CA | | (Approx. 1 week) |

Job Duties: Plaintiff stocked shelves and cleaned floors at Cataffo Market, located at 2301 Van Ness Avenue, San Francisco, California.  At the Western Merchandise Mart, 1355 Market Street, San Francisco, California plaintiff handed out flyers.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Wesix Electrical Heaters Co. Inc. Chico, CA | Wesix Electric Heater, San Francisco, CA | Electrician (Machinist) | 10/1964-3/1966; 7/1966-9/1966 |

Job Duties: Plaintiff worked on an assembly line putting heaters together and testing them. Plaintiff ran punch presses for different parts of heaters. Plaintiff installed and hooked up lights, switches and receptacles.  Plaintiff removed and reinstalled asbestos insulated wires during the

COMPLAINT FOR ASBESTOS PERSONAL INJURY/ PRODUCTS LIABILITY; DEMAND FOR JURY TRIAL

assembly and testing process. The asbestos containing insulation on the wires frayed during this process, depositing asbestos containing dust on plaintiff's hands.  Plaintiff helped to repair generators and motors from machines which broke down. Plaintiff welded, soldered and painted. Plaintiff does not recall the names of any co-workers. Plaintiff recalls the following supervisor: Mr. Hieb (San Francisco, California).

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| B M Tonkin Inc 80 Sir Francis Drake Larkspur, CA | Unknown | Unknown | 10/1964-12/1964 |

Job Duties: Plaintiff currently does not recall the details of this employment.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Armour & Company Dial Tower Station 2249 Phoenix, AZ | Armour Meat Packing Plant, So. San Francisco, CA | Laborer | 4/1965-9/1965 |

Job Duties: Plaintiff worked on an assembly line during the swing shift. Plaintiff ran the sausage peeling machine. Plaintiff worked with his father John Estes, Sr., deceased.

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Hunters Point Naval Shipyard San Francisco, CA | Hunters Point Naval Shipyard San Francisco, CA | Electrician | 3/24/1966-1973 |
| | | Electrician (Helper) | 3/24/1966- 3/1968 |
| | | Electrician (Limited) | 3/1968- 3/1970 |
| | | Electrician (Journeyman) | 3/1970 -1973 |
| | Shop 51 | | 3/1966-1971 |
| | Shop 99 | | 1971-1973 |
| | FLINT (AE-32) | | 11/1971-1973 |
| | KITTY HAWK (CVA-63) | Electrician | 1971-1972 (one day) |
| | RANGER (CVA-61) | | Early 1970s (1 day) |
| | CORAL SEA (CVA-43) | Electrician (Helper) | on and off for a total of 3 months |

| | | |
|---|---|---|
| ENTERPRISE<br>(CVAN-65) | | 3 occasions for a<br>total of 7 weeks |
| HANCOCK<br>(CVA-19) | | 1970 (1 month) |
| HORNE<br>(DLG-30) | Electrician<br>(Helper) | Late 1966 (6<br>months) |
| MIDWAY<br>(CVA-41) | Electrician<br>(Helper)<br>(Limited)<br>(Journeyman) | 1966-1972 |
| ORISKANY<br>(CVA-34) | | Late 1966 (2<br>months) |
| SANCTUARY<br>(AH-17) | | 4-10 months |
| TRIPOLI<br>(LPH-10) | Electrician<br>(Limited) | Late 1960s |
| PIGEON<br>(ASR-21) | | 2/1972-1973 (1<br>month) |

Job Duties: Plaintiff worked as an electrician, advancing from helper, to limited and journeyman. Plaintiff worked aboard surface ships, including aircraft carriers and submarines. Plaintiff worked below deck in the boiler and engine rooms. Plaintiff was initially assigned to the outside electrician Shop 51 where he was primarily assigned to the "wireway" gang. In the course of his duties, plaintiff retrieved spools of armored cable from the cable yard and moved them into place, typically with the help of cranes and riggers. Most armored cable was unwound from full reels which were placed on moveable rotating racks. Plaintiff pulled armored electrical cable throughout the ships. This process first required him to strip layers of the armored coating and insulation covering the cable back several feet in order to attach a sheathing which was in turn attached to a rope. The stripping of the armored cable in this fashion caused visible dust in the air which he breathed. The rope was then pulled through the pathways running through the various ship compartments with the armored cable attached, and advancing the cable into place. In addition, on several ships plaintiff pulled degaussing cable around the interior of the ship's hull. The cable was part of a system that "de-magnetized" the ship's metal hull. In the process of installation, plaintiff peeled back armored sheathing that covered the cable. In addition, once the cable was in place, at times plaintiff stripped wire leads and made connections to power panels and circuit breakers. As a helper and limited electrician, plaintiff, retrieved and positioned lighting lugs, tapes, distribution panels, lighting boxes, electrical switches, light fixtures and hangers for installation by the journeymen. Plaintiff installed and repaired electrical wiring and control cables. While performing all duties mentioned above, plaintiff disturbed asbestos insulation from pipes an bulkheads and removed other asbestos-containing materials in order to install wiring. Plaintiff worked in closed quarters with little to no ventilation and plaintiff did not wear respiration protection with the exception of an occasional 3M (3M COMPANY) two strap paper mask. Plaintiff worked in close proximity to other trades mixing, disturbing and spraying asbestos-containing fireproofing on to structural steel.

In 1971, plaintiff was assigned to Shop 99 as a journeyman electrician. Shop 99 provided temporary services to ships which were under repair at the shipyard, replacing what the vessel would otherwise be generating on its own if its power, steam and ventilation systems were not shut down. As a journeyman electrician, plaintiff set up moveable electrical panels, hooked up

electrical cables and laid out and moved cables and equipment from shore to ship. Plaintiff installed and moved temporary lighting and ventilation systems as the work areas changed throughout the ships. Plaintiff worked all over the vessels including engine and boiler rooms. Plaintiff disturbed asbestos insulation and other asbestos-containing materials in the course of providing these services. While serving in Shop 99, on various occasions, plaintiff participated in "pull-backs" wherein the tools, materials and equipment used by other trades would be removed from the work area so as to "reset" and remove hazardous safety conditions that had developed from the activity of other trades. These "pull backs" typically occurred during the night shift and lasted one day.

Throughout his time at Hunters Point while working out of Shop 51 and Shop 99 on the surface ships and submarines he was assigned to work on, plaintiff worked in close proximity to insulators removing and applying asbestos-containing pipe and block insulation. In boiler rooms, plaintiff worked in proximity to refractory workers removing and installing asbestos insulation and refractory mortar and block insulation used in to insulate boiler fireboxes. Plaintiff worked in close proximity to welders and boilermakers maintaining and repairing boilers.

Plaintiff worked in proximity to pipefitters and shipwrights removing and installing asbestos gaskets in valves and fabricating flange gaskets from sheet gasket material. Plaintiff worked around welders using asbestos blankets. Plaintiff recalls working within five feet of laborers as they removed lagging and disturbed asbestos insulation.

Plaintiff worked as an electrician's helper during the construction of the HORNE. Plaintiff ran armored cable throughout the ship. Plaintiff was primarily assigned to run cable and strip leads in the teletype room. Plaintiff was in the presence of journeymen electricians installing power panels and various compartments. On one occasion plaintiff installed asbestos-containing SQUARE D (SCHNEIDER ELECTRIC USA, INC. (FKA SQUARE D COMPANY)) breakers in a GENERAL ELECTRIC panel box, and then installed wire leads under the supervision of his supervisor. At the end of his shift plaintiff swept up after the work he and the journeymen performed. On lower deck levels, plaintiff ran degaussing cable around the outside hull of the ship. In the process of installation, plaintiff peeled back armored sheathing that covered the cable. Plaintiff visited his brother, John Estes , deceased, in a compartment below deck while he was installing gaskets on large valve.  Plaintiff worked in close proximity to welders, shipfitters, shipwrights, pipefitters, electricians, sheet metal workers and laborers while passing through the various compartments on the HORNE.

Plaintiff worked on the ENTERPRISE out of Shop 51 as a helper, as a limited electrician and then again as a journeyman electrician when he was assigned to Shop 99. As a helper, over a two week period, plaintiff installed armored M 30 and M 60 cable in a teletype room. Plaintiff's duties included the stripping of the armored cable and strapping it down so journeymen could complete the installation. Plaintiff cleaned up at the end of the day. At a later date, while working as a limited electrician, plaintiff was "loaned out" to Shop 56 plaintiff helped install "wave guides" atop the mast. This included running the cables up the mast and stripping back the covering. While assigned to Shop 99, in the 1971-1972 time frame, plaintiff set up and managed power cables and lighting throughout the drydock. Plaintiff was responsible for maintaining dockside power panels. At times, plaintiff's duties took him inside the ship where he passed through engine spaces. During this time frame plaintiff worked a night shift performing a "pull back" removing dangerous tripping hazards created by multiple trades working in the same area.

Plaintiff worked on the TRIPOLI as a helper pulling armored cable. As a limited mechanic, plaintiff installed lights on a cat walk inside the engine room, and a power panel on the outside deck.

On the KITTY HAWK plaintiff worked out of Shop 99 on a one day "pull back"removing dangerous tripping hazards created by multiple trades working in the same area. Plaintiff performed this work in one of the ship's four boiler rooms.

1  Plaintiff worked on the <u>MIDWAY</u> throughout his employment at Hunters Point. This aircraft carrier was undergoing major reconstruction throughout the ship. Plaintiff first worked on board
2  as a helper assigned to Shop 51. Plaintiff was promoted to "limited" while working on board and was put in charge of the "wireway gang". Plaintiff and his crew pulled "one millions feet" of
3  armored cable, which he documented over time, at the end of day. In the course of his duties, plaintiff retrieved spools of armored cable from the cable yard that stored reels of armored cable
4  and wire to be installed on the <u>MIDWAY</u>. Plaintiff and his crew moved reels into place, typically with the help of cranes and riggers. Most armored cable was unwound from full reels which were
5  placed on moveable rotating racks. Plaintiff pulled armored electrical cable throughout the ship. This included stripping layers of the armored coating and insulation covering the cable back
6  several feet and attaching a sheathing connected to a rope which facilitated the installation of the cable. In addition, plaintiff pulled degaussing cable around the outside hull of this ship. The cable
7  was part of a system that "de-magnetized" the ship's metal hull. In the process of installation, he peeled back armored sheathing that covered the cable. Plaintiff disturbed asbestos containing
8  bulkhead insulation while performing his work. Plaintiff also worked on the <u>MIDWAY</u> while assigned to Shop 99 and provided temporary electrical panels and power, ventilation and
9  temporary lighting throughout the ship, including engine and boiler rooms.

10  Throughout the whole time period plaintiff worked on the <u>MIDWAY</u> he was, at one time or another, in all four engine and boiler rooms, at times in proximity to refractory workers removing
11  and installing asbestos insulation and refractory mortar and block insulation used to insulate boiler fireboxes and near welders and boilermakers maintaining and repairing boilers. Plaintiff
12  worked in close proximity to insulators removing and applying asbestos-containing pipe and block insulation. In the engine rooms, plaintiff worked in proximity to pipefitters and shipwrights
13  removing and installing asbestos gaskets in valves and fabricating flange gaskets from sheet gasket material. Plaintiff working around welders using asbestos blankets. Plaintiff recalls
14  working within five feet of laborers as they removed lagging, and disturbed asbestos insulation.

15  Plaintiff recalls working onboard the <u>CORAL SEA</u> while working out of Shop 51. Plaintiff pulled armored cable which terminated in a communications room in the forward area of the
16  ship. Plaintiff stripped cable to expose leads in the course of his work. Plaintiff worked around journeymen electricians. Plaintiff cleaned up the compartment at the end of the day. Part of his
17  work included running cable down to the forward engine room where he observed other trades working.
18
19  Plaintiff recalls working out of Shop 51 as a helper in 1966 and removing and replacing burnt cables onboard the <u>ORISKANY</u> following a fire. Plaintiff's work took place over one month.
20  Plaintiff cut and sorted a tangle of charred armored cables and stripped the leads to expose the ends for splicing. Plaintiff pulled several full length replacement cables from the fire damaged
21  area down several deck levels to one of the four engine rooms on this ship. Plaintiff stripped and installed the cable leads into a power panel in the engine room. Plaintiff observed other trades
22  performing repairs on machinery while he was present in the engine room. Plaintiff worked near one of the boiler rooms where he observed other trades working on the boiler.

23  Plaintiff was assigned to the <u>PIGEON</u> while working out of Shop 99. Plaintiff installed and maintained, and moved temporary ventilation and lighting while repairs took place. Plaintiff
24  worked around Shop 51 electricians installing and repairing electrical components. Plaintiff was also present when flooring from lower decks was removed.
25
26  Plaintiff recalls boarding the <u>HANCOCK</u> for sea trials in San Diego during the time frame when he was assigned to Shop 99. Plaintiff recalls the ship vibrating while encountering rough waves,
27  which sent visible dust into the air. Plaintiff maintained temporary ventilation system and entered the engine room. During the ship's availability at Hunters Point, plaintiff worked in one
28  of the engine and boiler rooms for two days.

Plaintiff worked on the hospital ship <u>SANCTUARY</u> for a 10 month period while working out of Shop 99. Plaintiff set up moveable electrical panels, hooked up electrical cables and laid out and moved cables and equipment from shore to ship. Plaintiff installed and moved temporary lighting and ventilation systems as the work areas changed throughout the ship, including in the engine and boiler rooms. Plaintiff recalls an incident when a temporary power panel was wired incorrectly and "blew up" on one of his coworkers. Plaintiff disturbed asbestos insulation and other asbestos-containing materials in the course of providing these services including bulkhead insulation. Plaintiff worked in close proximity to insulators removing and applying asbestos-containing pipe insulation.

Plaintiff recalls attending to Shop 99 services on two submarines which had pulled in for repair at Hunters Point. Plaintiff recalls setting up shore to ship power and moving ventilation and lighting inside.

When plaintiff was assigned to Shop 99, he and others around him, would on occasion refurbish temporary power panels which the shop set up pier side, or on ship decks, for distribution of shore power during repairs. This refurbishment work occurred in Shop 99 and included the removal and installation of breakers in the panels.

Plaintiff recalls the following supervisors: Joe Kennel, deceased; Willie Chesson, deceased; Sam Ball Webber (San Francisco, California); George Garcia, deceased; and Phil Warda, deceased. Plaintiff recalls the following co-workers: John Trotter, deceased; David Ing, deceased, formerly c/o Brayton❖Purcell, LLP; John Bottoms, c/o Brayton❖Purcell, LLP; Frank Urriolagoitia, deceased; Gary Wilbur; Tom Route; Phil Corsetti, c/o Brayton❖Purcell, LLP; brother John Estes Jr., deceased, formerly c/o Brayton❖Purcell, LLP; Gene Santiago, deceased; Joe Hammond, deceased; Mack Clemons, deceased; and David Ivy (deceased).

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Mare Island Naval Shipyard Vallejo, CA | Mare Island Naval Shipyard Vallejo, CA | Electrician Shop 99 | 8/19/1973-1974 |
| | | Diver | 1975-4/30/1983 |
| | | Gas-Test Technician | 1984 4/1/1996 |
| | <u>DOLPHIN</u> (AGSS-555) | Electrician | 1973-1974 |
| | <u>MAUNA KEA</u> (AE-22) | Diver | |
| | <u>CARL VINSON</u> (CVN-70) | Gas-Test Technician | 2 days bench work |
| | <u>GRAYBACK</u> (APSS-574) | Diver | |
| | <u>GREENFISH</u> (SS-351) | | 1973-1974 (on and off for 6 months) |
| | <u>GUITARRO</u> (SSN-665) | Diver | 4/25/1979-4/27/1979 |

COMPLAINT FOR ASBESTOS PERSONAL INJURY/ PRODUCTS LIABILITY; DEMAND FOR JURY TRIAL

| | | |
|---|---|---|
| SAILFISH (SS-572) | | 1973-1974 (on and off for 6 months) |
| GUARDFISH (SSN-612) | | |
| HADDO (SSN-604) | Diver | |
| HALIBUT (SSN-587) | Diver | |
| KAMEHAMEHA (SSBN-642) | | |
| LA JOLLA (SSN-701) | | 1981-1983 |
| NAUTILUS (SSN-571) | | 1973-1980 |
| PARCHE (SSN-683) | Diver | 7/1979-8/1979; 2/1984-8/1984 |
| POGY (SSN-647) | Diver | |
| SEA WOLF (SSN-575) | Diver | |
| SNOOK (SSN-592) | Electrician | 1973-1974 (3 months) |
| GEORGE WASHINGTON (SSBN-598) | | 1973-1983 |
| FLASHER (SSN-613) | | 2/1984-8/1984 |
| ENTERPRISE (CVAN-65) | | 4/30/1983 |
| at Naval Air Station, Alameda, CA | | |
| POLLACK (SSN-603) | | 6/9/1982; 6/25/1982 |
| at Naval Air Station North Island, San Diego, CA | | |
| BARB (SSN-596) | Diver | 2/1984-8/1984 |
| at Naval Air Station, Alameda, CA Shop 99 located in Building 112 | | |

COMPLAINT FOR ASBESTOS PERSONAL INJURY/ PRODUCTS LIABILITY; DEMAND FOR JURY TRIAL

1   Job Duties: Plaintiff began his work at Mare Island as an electrician working out of Shop 99. He
2   transferred over from Hunters Point Naval Shipyard, when that base closed. When he first arrived
    he worked in the shop itself maintaining equipment used in temporary services, including repair
3   of wiring, ventilation equipment and temporary power panels.

4   From approximately August 1973 to 1975, while working full-time at benches in Mare Island's
    Shop 99, plaintiff routinely handled, opened and closed, cleaned and inspected, and refurbished
5   on a set maintenance schedule sealed manufacturer-identified "boxes" (aka electric "enclosures",
    "panels", "boards") of heavy duty commercial electric equipment, including equipment
6   manufactured by SQUARE D  (SCHNEIDER ELECTRIC USA, INC. (FKA SQUARE D
    COMPANY)) and CUTLER-HAMMER (EATON CORPORATION).  The manufacturers'
7   names and logos appeared prominently on their boxes of equipment and also on interior
    components of each manufacturers' box.  All of the asbestos-containing materials and
8   components plaintiff worked with in the boxes were supplied by the original equipment
    manufacturer and were easily observed and identified as original equipment manufacturer's
9   materials and components.  Throughout this work, plaintiff used compressed air, scrapers, sand
    paper, brushes and rags to remove the dust that had accumulated inside the boxes due to the
10  constant degradation of the asbestos-containing interior components (including arc and heat
    shields, insulated wire and cable coverings, phenolic insulating materials, and paper and
11  cardboard asbestos products).  All of plaintiff's work on the refurbishing and cleaning of these
    boxes of electric equipment caused visible, airborne dust which got on the plaintiff's hands,
12  clothes, face and hair.   Subsequent to plaintiff's performing this work,  Shop 99 began testing
    and identifying the same materials and components as asbestos hazards and precautions were
13  then taken by workers performing the same tasks previously performed by plaintiff (e.g.,
    mandatory use of protective masks and gloves, and dust barrier inserts used at the workbenches).
14  At the same time, while working at benches in Mare Island's Shop 99, plaintiff routinely
    handled, measured, inspected, repaired, stripped and spliced, worked with, and cleaned up
15  countless reels of white/grey "asbestos" insulated electric wire and cable made by several
    manufacturers, including:  ANACONDA (ERICSSON INC.), GENERAL CABLE (GENERAL
16  CABLE CORPORATION).  CAROL CABLE (GENERAL CABLE CORPORATION).  These
    wire and cable manufacturers' names and logos appeared prominently on their products,  reels,
17  spools and packaging.  The asbestos content of the electric wire and cables' insulation was
    obvious due to the appearance of the fibrous grey insulation materials,  the wire ratings indicating
18  asbestos content in the catalogues and on the products, and common professional knowledge.
    All of plaintiff's work with the asbestos-containing wire and cable materials caused visible,
19  airborne dust which got on the plaintiff's hands, clothes, face and hair.   Subsequent to
    plaintiff's' performing this work, Shop 99 began testing and identifying the same materials as
20  asbestos hazards and precautions were then taken by workers performing the same tasks
    previously performed by plaintiff (e.g., mandatory use of protective masks and gloves, and dust
21  barrier inserts used at the workbenches).  At the same time, while working at benches in Mare
    Island's Shop 99, plaintiff handled, measured, inspected, repaired, stripped and spliced, worked
22  with, and cleaned up white/grey "asbestos" insulated wire, cable and other insulation components
    on an estimated 25 to 60 thermocouples and associated reels of thermocouple wire manufactured
23  by HONEYWELL (HONEYWELL INTERNATIONAL INC.).  All of plaintiff's work with the
    asbestos-containing wire and cable materials caused visible, airborne dust which got on the
24  plaintiff's hands, clothes, face and hair.   Subsequent to plaintiff's performing this work, Shop 99
    began testing and identifying the same materials as asbestos hazards and precautions were then
25  taken by workers performing the same tasks previously performed by plaintiff (e.g., mandatory
    use of protective masks and gloves, and dust barrier inserts used at the workbenches).

26  The first submarine he worked on was the <u>DOLPHIN</u> which was located in Drydock No. 4.
    Plaintiff maintained shore power, ran ventilation, installed ventilation blowers, ran temporary
27  lights, installed strip heaters, and ran water and air hoses. On occasion plaintiff would go aboard
    and below deck however the majority of time was spent maintaining equipment along the pier.

28

1  Plaintiff was next assigned to the SNOOK. Plaintiff was promoted to lead man on his crew and
2  maintained shore power, ran ventilation, installed ventilation blowers, ran temporary lights, installed strip heaters, and ran water and air hoses.  Plaintiff installed temporary electrical
3  systems during this repair. Plaintiff installed lighting systems and strip heaters throughout the submarine. Plaintiff used asbestos blankets and cloth when installing heaters and electrical
4  wiring.  Plaintiff worked in close quarters with little to no ventilation and plaintiff did not wear respiration protection. Plaintiff used asbestos blankets while performing stress relieving on the
5  SNOOK. Plaintiff recalls laying on the asbestos blankets at the end of a 20 hour work day and falling asleep. Plaintiff worked in close proximity to other trades including welders, pipefitters,
   shipwrights, and laborers.
6
7  Plaintiff worked in close proximity to insulators applying JOHNS-MANVILLE (MANVILLE TRUST) block insulation; and mixing and applying JOHNS-MANVILLE (MANVILLE TRUST)
8  insulating cement. Plaintiff worked in close proximity to workers installing flooring tiles and using asbestos-containing W.W. HENRY (THE W.W. HENRY COMPANY, L.P.) flooring
   adhesive.
9
10 In 1975, plaintiff was asked to join Shop 72 as a diver, bringing to this crew his skills as an electrician. Plaintiff performed underwater repairs to submarines. Plaintiff removed, repaired,
11 and replaced submarine motors. Plaintiff performed underwater hull repairs. Plaintiff recalls performing diving work at Mare Island Naval Station, Vallejo, California; San Diego, California;
12 and Bremerton, Washington. Plaintiff later worked as a gas-test technician, and calibrated and repaired gas-test meters in Shop 99 in building 112.  Plaintiff recalls the following supervisors:
13 Wayne Walkup (Bremerton, Washington); Jim Farrell (Missouri); Jim Pipkin, deceased; Don Brown, deceased and Richard Jackson (Fairfield, California). Plaintiff recalls the following co-
14 workers: Donald Dunn, 707-644-5802; Charles Graham, Washington state; Francisco Lopez, 707-803-2509, Arizona; Michael Raymond; Larry Dunaway; Dennis Barnes; Rich Dafron,
15 deceased; Joe George, (Suisun City, California); Paul Wright (Vacaville, California); Mike Castellano c/o Brayton❖Purcell, LLP;  Sam Baker, deceased; John Edgar (Susanville,
16 California); Don Steinke, deceased; Neal Hemmert (Vallejo, California); Jim Torgerson, deceased; Fredrick Loyd (American Canyon, California)  and John Funk, deceased. Plaintiff
17 recalls the following supervisors: Richard Busby, c/o Brayton❖Purcell, LLP; and Gerald Tagert, deceased.  Richard Busby recalled the following Shop Planner: Bob Howard, Vacaville,
   California.
18

| Employer | Location of Exposure | Job Title | Exposure Dates |
|---|---|---|---|
| Self Employment | Unknown | Unknown | 1999-2000 |

21 Job Duties: Plaintiff currently does not recall the details of this employment.

22 NON-OCCUPATIONAL EXPOSURE:

23 FRICTION:
   In the early 1970s, plaintiff recalls helping his brother, John Estes, Jr., deceased, formerly c/o
24 Brayton❖Purcell, LLP, replace asbestos brakes in a 1960 Chevrolet. Plaintiff recalls the asbestos-containing brake shoes were purchased at GRAND AUTO (O'REILLY AUTO ENTERPRISES
25 LLC (FKA CSK AUTO, INC.)), 4th Street, San Rafael, California.